NicholsoN, C. J.,
delivered the opinion of the Court.
The questions to be decided in this cause, arise out of the administration of the estate of the late James Fulton. He died in Lincoln county, on the 15th of February, 1856, having made his will in 1843, which was materially altered by a codicil executed only three days before his death. He was seized and possessed a large estate, consisting of lands, slaves and other personal property. He appointed John M. Bright, John S. Fulton and Robert A. McDonald, to execute his will. They accepted the trust, proved the will, were qualified, and executed a joint bond, with securities, for the proper discharge of their duties.
The lands and slaves were sold, under decrees in the Chancery Court, yielding, about one hundred and thirty thousand dollars. But of this amount, it is alleged that about twenty-seven thousand dollars have been lost to the legatees and devisees, and that two of the executors, John M. Bright and John S. Fulton, and the Clerk and Master, Robert Farquharson, should be held responsible for the loss.
The several questions in litigation between the parties, are raised upon numerous exceptions to the report of a special commissioner, who was appointed with plenary powers, to take proof and report upon all the matters contested between the parties. We deem it unnecessary to allude in detail to the exceptions taken to the report of the commissioner, on both sides, as we are satisfied that there are a few principles of law which must control the result.
*624 We deem it proper to remark, that we find nothing in the record which creates the slightest doubt as to the entire integrity and good faith of all the parties involved in the litigation. There is no reason to believe that there would have been either loss to the estate, or litigation among the legatees, but for the public events which suspended the final settlement of the administration, and which resulted in the death of one of the executors, who had special charge of the financial department of the trust.
It is one of those cases in which a court of equity is called upon to apply the principles which must determine where a loss is to fall, where neither fraud nor bad faith can be attributed to either party.
It is not controverted, that when John S. Fulton made his last settlement, prior to entering into the military service in which he lost his life, he had in his hands a considerable amount of the funds of the estate. Nor is it disputed, that he died with this amount unpaid and unaccounted for.
The controversy is, whether John M. Bright, as his co-executor, is responsible to the estate for the amount so unaccounted for. The determination of this question depends upon the character of the trust assumed by the executors, the circumstances under which the funds came into the hands of John S. Fulton, and the connection which John M. Bright had with the receipt of the funds by John S. Fulton.
When John M. Bright, John S. Fulton and Robert A. McDonald were qualified as the executors of James Fulton, they undertook the execution of his last will and testament. By their bond, they gave security for the *625 faithful execution of the trust. Whatever duties or trusts were devolved upon them by the terms of the will, they undertook faithfully to discharge. For. the duties and trusts which they assumed, we must look to the will.
As already stated, the original will was made in 1842. It is remarkable for its brevity, as follows: “I, James Fulton, of Fayetteville, Lincoln county, Tennessee, do make this my last will and testament: 1st, I desire that all my just debts be paid. 2d, I give and bequeath the whole of my property, both real and personal, to my wife and my nine children, to-wit: Alfred, James, John, Frank, Martha, Jane, Laura, Virginia, and the youngest child now living, which has not been named, together with any children I may hereafter have; said property to be equally divided among my wife and said children; and should any of my said children die before' attaining to the age of twenty-one, unmarried, then the share which I have bequeathed to such child shall be equally divided among the balance of my said children. Witness my hand and seal this 20th of September, 1842.”
By this will, no executors were named, and the only duty specified to be performed by his representative, is that of paying the testator’s just debts. For this purpose, the representative would be governed by the law, in appropriating the personal effects, as the testator gives no directions as to the special manner in which, or the property out of which, he desired the debts to be paid.
As already stated, on the 12th of February, 1856, the testator executed a codicil, in which he provides, that the property given to his several daughters, by his will o. *626 1842, should be for their sole and separate use. He also makes special provisions, and gives special directions for ascertaining the share of his daughter, Margaret Davidson. He next specifies the advancements made to several adult children, and provides for equalizing the shares of his three minor children. He gives his Law Library to his sons. He then makes an alteration in his former bequests to his wife, giving her additional articles of property. He then adds this item: “It is also my will and desire that my farm on the north side of Elk Diver be carried on the present year, before any division; and cotton and mules sold for cash, here or elsewhere, by my executors, for paying my debts.” He then nominates and appoints D. A. McDonald, John S. Fulton and John M. Bright his executors.
It is clear that the only duty imposed by the codicil upon the executors, in addition to that imposed by the original will, was in regard to having the farm carried on for the year 1856, and for selling his cotton ana mules, at home or elsewhere, for the payment of debts.
It follows, that the entire trusts assumed by the executors, upon their qualification, were to have the just debts paid and to have the farm carried on for the year and to sell the mules and cotton, at home and elsewhere, for the payment of debts. The joint bond, which the executors made, is not in the record, but we may assume that it was in the usual form, and that it bound the executors to discharge all the trusts imposed upon them by the will and the law. The will imposes no trusts as to the land or slaves, upon the executors, except as to their *627 use during the year 1856, in making a crop; and the bond which they executed could impose no other, than the corresponding obligations.
Upon the qualification of the executors, the title to the personal estate of the testator, except the slaves, vested in them in trust, for the payment of his debts, and after their payment, for the distribution of the residuum. Until the construction of the Act of 1827, c. 61, made by this Court at its December Term, 1853-, in the ease of Savage v. Hale & Coggin, 1 Sneed, 365, slaves were considered as personal property, and as such, legal assets in the hands of administrators and executors. In that case, the court held, that “since the act of 1827, c. 61, the title to slaves does not pass to the personal representatives, as before that act was the case as to all personal property, but to the distributees, as land goes to the heirs on the death of their ancestor, with no other exception but that the administrator is bound to take possession of them, and if not required to pay debts, to distribute them.” This decision has been followed and recognized in numerous cases from that time down to the present term of the Court.
It follows, that upon the qualification of the executors, the slaves did not pass to the executors as legal assets, but that until it could be ascertained, whether they would be required in payment of debts, it was the duty of the executors to hold and protect the slaves: Cheek v. Wheatly, 3 Sneed, 484; and when the executors should ascertain that the slaves would be needed in payment of debts, they could only convert them into money for that purpose, by resorting to a Court of Chancery. The slaves, therefore, were clearly equitable, and not *628 legal assets, in the hands of the executors: W’ms on Ex’rs, 1033; Hughlett v. Hughlett, 5 Hum., 469.
In the case last cited, Hughlett v. Hughlett, a testator had directed his executors to sell personal and real estate, for the payment of his debts. The executors had executed a joint bond, and therefore were responsible for the acts of each other, so far as the personalty was concerned, but as the County Court had no power under the act of 1813, to take a bond from executors, for the faithful performance of their duties, except in administering the legal effects of their testator’s estate, there was no mutual liability created by the bond, as between the executors in relation to the equitable assets. Much more clearly would these consequences follow in the case. before us, inasmuch as the will of the testator confers no power and imposes no duty, on the executors, which requires them to sell either land or slaves for the payment of his debts. The only power or duty conferred or imposed upon them is, that if the personal ■effects to be administered, should be insufficient to pay the debts, then they should be authorized by implication of law, to apply to a Court of Chancery, to subject such of the slaves.as might be required to pay the ■debts. The testator indicates in his will no doubt as to the sufficiency of his personal effects, including the crop of 1856, to pay his debts, and hence he makes no provision for such contingency. If such contingency actually occurred, and the executors applied to the Chancery Court for the sale of slaves, they did not and could not do so in pursuance of the directions in the will, but in pursuance of their duties as executors under the *629 law to have the debts paid. Their undertaking, as executors, was to apply the legal assets to the payment of the debts. As held by Judge Turley, in the case of Hughlett v. Hughlett, the word “executors” is a technical term, and applies to duties to be performed in relation to the goods and chattels, rights and credits of the testator in contradistinction to that of trustee, which applies to duties to be performed in relation to real estate;” and since the decision in Savage v. Hale and Coggin, 1 Sneed, 365, we may add, in relation to slaves.
The result is, that the executors were acting in a double capacity, as executors in regard to the legal assets, in pursuance of the duties imposed by the will, and as trustees in regard to the equitable assets, but without having their trust imposed by the will. Having given a joint bond, they were mutually liable for their acts as executors, but individually and severally, liable for their acts as trustees: 2 W'ms on Ex’rs, 1652; Hughlett v. Hughlett, 5 Hum., 469; Deaderick v. Cantrell, 10 Yer., 268.
It is not denied in the argument, that all the money derived from the sale of the slaves, from their hire, and from the rents, for which it is sought to hold Bright responsible, was in fact, received by Jno. S. Fulton. Nor is it controverted, that as a general proposition, when there are two or more trustees, who have entered into a joint bond, they are not responsible for acts done or moneys received by each other, unless the liability is fixed by facts and circumstances which show that the acts done, or moneys received by *630 one, were consented to and approved by the others. But it is .insisted, that the facts and circumstances fix upon Bright a legal responsibility, although the moneys were received by Fulton.
It may be proper here to refer to the bill, under which the proceedings were had, which resulted in a decree for the sale of the slaves. The bill was filed on the 4th of February, 1867, by R. A McDonald, John . M. Bright, and John S. Fulton, Executors of James Fulton, deceased, and all the adult legatees and devisees, except- Martha Davidson, who was made a defendant, as were also the minor legatees and devisees. Jno. M. Bright and Jno. S. Fulton were the solicitors who filed the bill. Complainants allege, that the lands and slaves would not be susceptible of an advantageous division, and that it would be manifestly to the interest of all the legatees and devisees, that the same be sold for partition. They also allege, that the testator was considerably indebted at his death, but they think it probable that the proceeds of the perishable property, growing crops, and debts owing the estate, may be sufficient to pay off said indebtedness, if the whole of the sum can be realized; in the event, however, there should be a deficiency of such effects, they wish to reserve the right of asking an appropriation of a portion of the fund, for the payment of such deficiency. The answer of Mrs. Davidson concurs in the correctness of the allegations of the bill, and the minors by their guardian ad litem, Robert- Farquharson, answer formally.
The ex parte affidavits of R. A. McDonald and Jno. *631 S. Fulton, were taken by the Clerk and Master, as to the necessity of selling negroes to pay debts, and they state that it may be necessary to reserve about $ 10,000, though they say it may not be required; they do not think it will all be required.
The proof as to the impracticability of dividing the land and slaves, was abundant.
It is manifest that the real object of the bill was, to obtain a decree of sale of the land and slaves for distribution, and not for the payment of debts. Neither the allegations of the bill, nor the proof, would, at that time, have authorized a decree of sale of any portion of the slaves for the payment of debts. But the proof was sufficient to authorize a sale for partition, and such a decree was made, directing the Clerk and Master to make the sales, and to take the notes payable to- himself. Upon the making of this decree the court took charge of the further execution of the trusts, and the executors, as such ceased to have any further connection with, or control over, the proceeds of the sales. When the court ordered, that ten thousand dollars of the proceeds of the sale of these slaves, should be reserved by the Clerk and Master, from distribution, and be held subject to be applied, if necessary, by the executors in payment of debts, they could not receive the fund in their character of executors, but as trustees or receivers .of the court. In this capacity they were not bound to accept the trust, and if they did, they would be responsible only for their individual acts, except upon the law which governs the liability of co-trustees for the acts of each other. The fact that the court designated them *632 as executors, in the decree, could not clothe them with the duties and responsibilities of executors, under the bond which they had executed.
But it is insisted, that when the Clerk and Master sold the slaves, and reported that $10,000 had been reserved for the executors, as well as when he reported that the $10,000 had been paid over to the executors, and that he had taken their bond with security, Jno. M. Bright drew the several decrees, ordering the money to be thus paid over, and confirming the report of the Clerk and Master, stating that it had been paid over to the executors, and therefore that he is estopped from denying his liability; although the proof shows, that in fact, the money was paid only to John S. Fulton, one of the executors, and his receipt alone taken for it, and his bond alone, if any, executed to the Clerk and Master.
The fact that Mr. Bright, as solicitor, drew the decree, ordering the Clerk and Master to reserve $10,000 of the funds, and pay it over to the executors, could have no other effect, than to fix upon him knowledge that such an order had 'been made, and to furnish presumptive evidence that he was williug to accept the trust.
But the decree, confirming the report of the Clerk and Master, made at the August Term, 1860, in which the Master reports that he had paid over' to the executors $10,000 of the proceeds of the sales of slaves, and $2,303 derived from their hire, which decree was in the hand-writing of Mr. Bright, is mainly relied on to fix his liability. The Clerk and Master reports, *633 that he has paid “to the executors, J. S. Fulton and others, $10,000,” and that “he has paid to the executors of James Fulton $2,303.40, the hire of the slaves.” The report proceeds: “For all payments above reported, the undersigned has taken and filed proper receipts; but before making payments to any executor, administrator or guardian, he caused them to give bond according to law; which bonds, together with said receipts, accompany this report.”
Then follows the decree of confirmation, as follows: “To Avhich report no exceptions being taken it is in all things confirmed.”
It is argued, that as Mr. Bright drew this decree of confirmation, it is an admission that the amounts reported by the Master were received by the executors, by which he is estopped. In Heane v. Rogers, 9 B. & C., 577, it is laid down, that, “the express admission of a party to the suit, or admissions implied from his conduct, are strong evidence against him; but he is at liberty to prove that such admissions were mistaken or were untrue, and he is not estopped or concluded by them, unless another person has been induced by them to alter his condition.” It. is observed that while the decree recites that the $10,000 was paid over to the executors; yet the accompanying receipt, which is part of the decree, shows .that the recital was erroneous, and that it was paid to Jno. S. Fulton only. The error or mistake in the recital, therefore, can not es-top Mr. Bright from showing by the decree itself, that it was a mistake, and that he was led into it by the erroneous statement on the face of the report of the *634 Clerk and Master. It is evident that the Clerk and Master misapprehended the character in which John S. Fulton was acting in receiving the money. He went upon the supposition that the money was being paid to Fulton, as one of the executors, and that his receipt of it was the receipt of all the executors. Hence he reported it as paid to the executors, when his receipt showed that it was paid to John S. Fulton alone. It is equally evident that Fulton misapprehended the character in which he was receiving the money, for we find that in his settlement with the County Court, in June, 1860, he charges the money received to all the executors. On this settlement, made by John S. Fulton alone, there was a balance found against the executors. This balance was the residue of the $10,000, after deducting disbursements. In June, 1861, John S. Fulton made another settlement with the County Court, in which the account was stated between himself alone as executor, and the estate of his testator. In this account he charges the balance to himself and not to the executors. This settlement was made shortly before he entered the army in which he was killed. We may fairly presume, that, this settlement was made in view of his being about to enter the military service, and that he might leave a record of his own liability for the $10,000, and to show that his co-executors were not responsible for it. It shows not only that his co-executors were under no liability for this fund, on account of having joined with him in receiving it, but that he alone was chargeable with it, as far as he could make himself responsible by an ad *635 mission of record, that the money was in bis bands: 2 W’ms on Ex’rs, 1655; 4 Ves., 608; 1 Sch. & Leffr., 341; 1 Dev. & Battle, 336; 1 Ired Eq., 93-7; J. C. R., 295; 10 Yer., 268; 10 Peters, 234.
It is argued, however, that an agreement was entered into among the three executors, by which each one undertook to execute specific duties in carrying out the trusts of the will, and that this agreement made each one liable for the acts of the others. The proof as to such an agreement is entirely unsatisfactory. One witness has an impression that he heard Jno. M. Bright say something that indicated that there was some sort of agreement. Another says that there seemed to be a sort of tacit agreement, that Bright was to attend to the law business, Fulton to take charge of the finances, and McDonald to attend to the out-door business of the estate. But what were the specific terms of the agreement, to what extent, if any, they were to be liable for each others acts, or whether the agreement referred to their acts as executors under the will, or as trustees under the appointment of the court, the proof wholly fails to show. We can, therefore, make no inference from this vague and uncertain agreement as to a joint liability. But it is insisted, that although there might be no joint responsibility of the executors for equitable assets that came into their hands as trustees, and not as executors, as the law stood before the act of 1838, c. Ill, s. 18; yet, that after that act, the executors would be jointly liable for the acts of each other, as well in regard to equitable as to legal assets. That act was intended to make executors and *636 their securities responsible for the administration of the trusts imposed by a will, whether as to legal or equitable assets, in the same way and to the same extent as administrators and their securities were liable before its passage. The equitable assets must arise under trusts prescribed by the will, and not be such as arise from trusts imposed by the court, and not by the will. If James Fulton had directed his executors to sell his lands or slaves for the payment of debts, or for distribution, and they accepted the trust, and entered into a joint bond, they and their securities, under the act of 1838, would be responsible for the acts of each of the executors, in the disposition of the equitable assets arising from such sales. But as no such trusts were imposed upon the executors by the will as made, the act of 1838 has no application to the case.
The result is, that as to the proceeds of the sale of the slaves and of their hire, and of the rents of the lands there was no joint liability assumed by, or resting upon, the executors; but that the liability rested on John S. Fulton only, as trustee or receiver, as he only, received the funds arising from these sources.
But in holding that John S. Fulton alone was responsible for these funds, we do not think that he was 'guilty of a devastavit in receiving them from the Clerk and Master. The proof shows that he received them as a trustee, or receiver, under the orders of the court. It is evident that he misapprehended the character in which he was holding the funds, and it is not improbable that the court labored under the same *637 misapprehension as to the legal effect of the order directing the funds to be paid over to the executors. But, however that may be, the legal effect of the order was to authorize the persons filling the description of executors of James Fulton, to receive the funds as trustees or receivers of the court. When John S. Fulton accepted this'trust, he became thereby an officer of the Chancery Court. Instead of carrying these funds into the settlement of his accounts as executor with the County Court, his report ought to have been made to the Chancery Court. But the funds were rightfully in his hands, and the fact that he made the mistake of accounting for them in the County Court, furnishes no evidence of a devastavit. It does furnish evidence, however, that in June, 1861, when he made this settlement, he was responsible for so much of those funds as had not been applied in payment of the debts of the estate. tie had the right to continue to hold the residue of the funds for the purpose of paying other debts, and he could not be chargeable with interest thereon, unless it should be shown affirmatively that he converted it to his own use, or that he made interest upon it, or that he failed through negligence to apply it in payment of debts. The proof shows no such case for charging him with the interest: 7 Yer., 172, 213.
The proof shows, that under the decree for the sale of the lands, the first sale took place on the 22d of October, 1859, the second on the 18th of August, 1866, and the third on the 8th of August, 1867. A question arises as to the responsibility of the executors, *638 for the rents of the lands after the year 1856, and until the final sale in 1867. After the year 1856, the executors ceased to have any authority under the will to control the lands. Of course, then, as executors, they are under no liability growing out of the renting of the lands. The law imposed no duty of this kind on them as executors. The proof, however, shows that some portions of the real estate were occupied by members of the family, and that other portions were rented out by John S. Fulton. So far as any portion of the lands were occupied by members of the family, they would be liable to account to the estate for a fair annual rent; and so far as John S. Fulton undertook to rent out any of the lands, he would only be responsible for the rents actually received; and if he occupied any of the lands himself, he would be accountable for reasonable rents; and if any of the other devisees rented from him, and are in arrears for their rents, they are liable to account for the same according to their contracts with John S. Fulton; and if any of the lands were unoccupied, no liability therefor would rest upon John S. Fulton. These are the necessary results of the failure of the testator to require his executors to control the lands after 1856. It appears from the proof, that at the sale of the lands in August, 1859, John S. Fulton purchased a large quantity of the lands, and executed his note therefor with security; and upon his failure to pay therefor, the lands, by a decree of the court, were re-sold; and that at the re-sale, the lands failed to bring an amount sufficient *639 to satisfy tb.e notes executed by him, with interest thereon. It follows that his estate and his securities, are liable for the deficiency to the estate of James Fulton.
As it does not appear that there was any want of diligence in the collection of the note of Todd & Steele, the executors will not be responsible, if the same should be lost.
It appeai’3 in the record, that the question of compensation to John M. Bright for his services as solicitor, was referred to the Clerk and Master, who took proof and reported that $2,500 would be a reasonable compensation. The proof shows an amount of services, not only in the cause commenced for the sale of the land and slaves, but in other suits in which the estate was involved, which might have entitled him to a larger compensation than that reported by the Clerk and Master. But it is insisted for the legatees, that he ought to be allowed no compensation, on account of a loss sustained by the estate in consequence of a professional mistake made by him in filing the original bill for the sale of the lands and slaves. The mistake relied on, consisted in his making the minor legatees complainants, instead of defendants to the bill. It appears that a decree of sale was made under the original bill, that the sale took place, and that afterwards some of the parties in interest becoming suspicious of the validity of the sale, carried the case to the Supreme Court, where the case was remanded for the filing of an amended bill, making the minor legatees defendants, instead of complainants. It *640 is said, that, in consequence of this appeal and the remanding of the cause, it became necessary to have another decree of sale, under which the property sold for a less price than at the former sale. Hence it is earnestly ai’gued that the estate sustained a loss in consequence of the professional error of the solicitor, for which he ought to forfeit all compensation.
The argument rests upon the assumption that the Supreme Court, in ■ two cases, one decided in December, 1855, and the other in April, 1856, had decided that it was error, in filing bills under the act of 1827, c. 61, to make minors complainants, instead of defendants; and that it was culpable oversight in Mr. Bright, not to have known of these decisions. But upon examination of the cases referred to, it is found that neither of them bears out the assumption upon which the argument is rested. In the case of Elliott v. Cochran, 2 Sneed, 468, decided at December Term, 1855, Judge McKinney held (Judge Caruthers dissenting) that, in a proceeding under the statute of 1827, by the personal representative, the parties interested in the subject matter, and in whom the title is vested, must be made parties.” The only question in the case was, whether a bill, under this statute, filed by the executor or administrator alone, without making the distributees or legatees parties, could be maintained. But whether minor distributees or legatees should be made complainants or defendants, is not decided or alluded to. In the case of Cheek v. Wheatly, 3 Sneed, 494, decided at- April Term, 1856, it is held that the title to slaves vests in the distributees *641 of an intestate, and not in the administrator, under the act of 1827. No allusion is made in the opinion as to making minor distributees complainants or defendants. In point of fact, it was not until the December Term, 1857, that the Supreme Court decided that “in all cases in equity where it is sought to affect the interests of infants, and more especially their interests in real estate, by an attempt to charge it, or to make partition or sale thereof, the infants ought to be 'made defendants.” This decision was made more than a year after the filing of the original bill by Mr. Bright, in the case before us. Nor was it' held in the case alluded to: Davidson v. Bowden, 5 Sneed, 129, that purchasers at a sale of land and slaves, made under a decree rendered in a case in which minors were made complainants, instead of defendants, would not get a good title. It was only held that the making of infants complainants in such cases, instead of defendants, was error, for which, upon appeal or writ of error, the decree would be reversed. But in the case of Winchester v. Winchester, 1 Head., 460, it was decided, E. H. Ewing, Special Judge, delivering the opinion, that “it would be going too far, after what has already been shown, to declare a proceeding by a petition, under the act of 1827, void.” It follows that the decree of sale, under the original bill filed by Mr. Bright, was not void, but that the purchasers at the sale, under that decree, would have had good titles, if the report of sales had been confirmed, either under the proceeding by the original bill, or under the proceeding by the *642 amended bill. The filing of the original bill,, making the infants complainants, under the circumstances, was no such professional oversight, or dereliction, as could either detract from the professional standing of the solicitor, or in any degree affect his right to compensation.
But it is argued that the estate was greatly damaged by the delay in procuring a sale of the lands and ne-groes, and that this delay was the result of the error of Jno. M. Bright in not making the infant legatees defendants to the original bill. Upon looking into the action of this court, at its December Term, 1856, upon the original case, which was brought here by writ of error at the instance of the defendants, we find that the only question presented to the court was, whether the infants ought not to have been defendants instead of complainants. The decree in the case shows that the court declined to decide the question, but remanded the cause to the Chancery Court to be amended and proceeded in, and taxed the parties who brought the case here by writ of error with the costs. Up to that time, therefore, the Supreme Court had declined to reverse a decree for such an alleged error. But the real error which caused the delay was in the action of the Chancellor in setting aside the sales when the case was returned to his court. It was remanded and not reversed; it was remanded that the bill might be amended; not that the decree should be vacated and a new bill filed. Nothing was required but to shift the position of the infants, to have a guardian ad litem and a confirmation of the first sales. The delay resulted from the action of the Chancellor, and for this the solicitor could not be held responsible.
*643 Nor does the fact that Jno. M. Bright was executor, as well as solicitor for the estate, interfere with his right to compensation as a solicitor or counsellor. Every exeoutor or administrator has a right to procure the necessary legal counsel in administering his trust, and to pay reasonable compensation therefor out of the assets of the estate. If the executor or administrator is himself an attorney at law, he may either employ other counsel or he may give to the business his own professional services. In the latter case, he is entitled to the same compensation which he would have paid to another attorney in the former case. There is no incompatibility in the two offices of executor and solicitor. He is entitled to just remuneration for the value of his services in both capacities,- to be ascertained by proof. This proposition is true and applicable as well to Jno. S. Fulton as to Jno. M. Bright in the case before us. We are satisfied that the proof fully sustains the allowances reported by the special commissioner as to the compensation of the executors as such, and of the solicitors, Jno. M. Bright and Jno. S. Fulton, as such.
It appears from the record that the County Court, upon a settlement made by the executors in 1859, allowed as part compensation for their services $2,000, of which Jno. M. Bright received $500, R. A. McDonald $500, and Jno. S. Fulton $1,000: the two former agreeing to accept no further compensation. In addition to the allowance of $1,000 to Jno. S. Fulton so made, the special commissioner allowed him $1,250 for further services.
Assuming that $1,000 was a fair compensation for *644 the services rendered by Jno. S. Fulton up to the time that allowance was made, and in view of the fact that his services as executor had then nearly ceased, we are of opinion that an additional allowance of $500 would be reasonable and proper.
The record shows that Eobert Farquharson was appointed special commissioner by the Chancellor for the sale of the land and slaves, and that he discharged the duties of his appointment by selling the property under both sales; and as such commissioner took the notes of the purchasers, made collections and disbursements under the orders of the court, and acted as trustee for loaning out the funds belonging to three of the infant legatees. Several questions are raised as to his liability, in specified cases, and as to the compensation to which he was entitled, which we are required to determine.
He would be liable, in general terms, for all the sale notes taken by him, and for all moneys collected by him, together with interest actually received when the notes have been collected, and the interest actually due on sale notes or judgments not collected. To discharge himself he must show how he disposed of the several notes and how he has applied the moneys received, together with all interest actually received by him and due from him.
It is shown that he received from the sale of slaves a fund amounting to about $11,000, which belonged to three of the minor legatees who had no guardians. He was appointed trustee for these infants, and was ordered to loan out the fund on good securi *645 ty. The proof shows that he loaned out several thousand dollars of this fund to Jno. S. Fulton without security. Although it appears that Fulton was at the time entirely solvent, yet it was loaned in violation of his duty, and he is therefore chargeable with the amount and interest. But the record shows that whilst the three minors had no guardians, Jno. S. Fulton furnished to them necessary supplies, amounting to over $2,-000, which was reported to the court and the expenditure approved and sanctioned, and an order made that the amount should be paid to him by their trustee. This amount, with interest, is properly a credit on the amount due from Jno. S. Fulton to the trustee for the funds loaned without security. The trustee, therefore, will only be chargeable with the residue, after allowing this credit.
As the first sale of the land and slaves was set aside, a question is made as to the amount of compensation to which he is entitled. This is governed by the statute which was in force at the date of the sale. It is not a matter of discretion under the act of 1855, c. 264, s. 3, but is fixed definitely at $75.
It appears that the second sale of the slaves was made on the 4th of January, 1858, when the notes of the purchasers due at twelve months, were taken. The act of 1855 was then in force, and governed his com.-pensation as to the simple duty of selling and taking notes. But on the 8th of March, 1858, an act was passed, changing the amount of compensation to be allowed to clerks and masters and special commissioners. This act was carried into the Code as sections 4551 *646 and 4552. By this act it is provided, that “when the amount of the sale shall exceed the sum of $6,000, the court may make such additional allowance as may be deemed just and reasonable, provided it shall not exceed two per cent, upon the whole amount of sale.” This law governs the compensation to be made for the collection and disbursements of the notes taken upon the sale of the slaves and for the sale of the lands, and taking the notes and collecting and disbursing the same. In view of the fact that the compensation allowed for the first sale is regarded as entirely inadequate for the amount of work shown to have been done, we can not say that the allowance of two per cent, on the amount of the several sales of land and slaves, reported by the special commissioner, was unreasonable. In like manner we concur, with him in regarding the allowance of $115 as reasonable for collecting and disbursing about $2,300 from the hire of slaves. This allowance, as well as the allowance of $1,500, for keeping and saving notes belonging to the minor legatees, amounting to about $11,000, during the perils of the war, is fully sustained by the proof, and is therefore proper.
The special commissioner, Farquharson, is entitled to have the several amounts of commissions and allowances, with interest, credited upon the amount for which he may be found liable as already indicated. But as to the $10,000 and the $2,300 paid over to John S. Fulton by order of the court, the special commissioner incurred no liability for failing to take security, as he was not required to do so by the order of the court; *647 and as the proof abundantly shows that at that time John S. Fulton was entirely solvent.
In the view we have taken of the law and the facts in proof, John S. Fulton acted as a receiver and officer of the court in receiving the proceeds of the sale and hire of slaves, and in renting out the real estate. In that capacity, the law attaches to him no liability to account for interest, unless it is shown that he converted the funds in his hands as receiver, to his own use, or that he made interest upon the funds, or that he failed to account for them, when properly demanded.[1]
The record furnishes no evidence that he incurred the liability to account for interest on either ground. The proof shows that he kept a private record of his transactions and doings as such officer of the court. This was, no doubt, intended by him to be used in making his report and settlement with the court, and with the other beneficiaries. It is therefore to be taken as evidence as to his conduct in the execution of his duties as receiver. The circumstances satisfy the court that he acted with fidelity and integrity in his conduct as receiver, and that nothing but his connection with the civil war, and the loss of his life therein, prevented *648 him not only from rendering a satisfactory account to the court and the other legatees, but also from paying over the funds which came into his hands in the discharge of his duties as receiver. He is therefore liable to account for the funds so coming into his hands, but without interest, and he will be credited with compensation for his services as receiver in addition to the allowance made to him by the County Court as executor. It appears from the proof that ten per cent, on the amount of rents actually received by him would be reasonable. This was allowed by the special commissioner. and we see no reason to disturb his report in that respect.
A question has been discussed as to the appropriation of the share of John S. Fulton in the estate of his father, James Fulton. We have already seen that upon a re-sale of the lands purchased by Jno. S. Fulton, they fell short, of satisfying the original notes executed by him with security for the lands. He is therefore indebted to the estate in a considerable amount, on account of this deficiency. It also appears, that upon taking the account of his transactions as executor and receiver, he will be found considerably in arrears to the estate. The question is, to which indebtedness shall his share in the estate be applied? ' It is a rule sanctioned by authority that when a debtor owes two distinct debts to the same creditor, and makes a payment, if there is no contract controlling, the debtor may elect to which debt the payment shall be applied. If no election has been made, and it devolves on the court to make the application, the rule is to apply *649 the payment to the debt which rests heaviest on. the debtor, or to the debt which is of oldest date: Bussey v. Gant, 10 Hum., 238; Domat, § 2282; 4 Mass., 333, and 5 Mass., 82.
For the satisfaction of the amount which may be found due from John S. Fulton upon the balance on the purchase of land, his interest in the estate of Jas. Fulton, deceased, will be first appropriated.
As the appeal in this case was taken before the final report ordered by the Chancellor to be made, after the several exceptions had been passed upon, we deem it unnecessary to do more than to remand the cause, that the special commissioner may make his final report to the Chancery Court, in doing which he will be governed by the directions given and principles settled in this opinion.
On account of the large amount involved in this cause, and the great interest which has been manifested in its investigation by the counsel, we have given to the immense record before us a laborious examination, and have arrived at the results already announced.
In this examination, we deem it not improper to state, that we have been gratified to find in it nothing which casts the least imputation upon the characters of any of the parties, either the dead or living, for strict integrity and honesty. Whatever losses have occurred can be easily traced to the unavoidable casualities of the late protracted civil war. If the chief actor in the settlement of the estate had survived the war, we have every reason to suppose, from his high character for *650 integrity and fidelity as exhibited in the record, that but little if any loss would have occurred. It is highly probable, from all the circumstances, that, with him perished most of the funds, the absence of which constitutes the great body of-the real loss.
The cause will be remanded to be proceeded in according to the directions indicated in this opinion.
Mr. "Wade presented a petition for re-hearing, reviewing the-conclusions of the court:
First — On the construction of the act of 1837-8, c. Ill, s. 18, and citing the cases of Lester v. Vick, 2 Heis., 476, and Porter v. Moores, MS.; Code 2342, 2352.
Second — On the duty of executors in regard to the sale of slaves.
Third — On the doctrine that slaves were equitable assets.
Fourth — On the time of the decision that minors must be defendants, citing 1 Swan, 75.
Fifth — On the effect upon a sale of error in making minors defendants, citing 11 Hum., 489.
Sixth — On the. conclusion that the executors were not liable for rents on their bond, by act of 1837-8, c. Ill, s. 18.
Seventh — On the allowance of 10 per cent, commission on rents, accounted for when $6,000 of rents out of $12,000 remain unaccounted for, citing M. & A., of Winchester v. Slatter, 2 Heis., 65.
Eighth — On the allowance of commissions on $132,-000 of proceeds of sales, when all but $20,000 of this *651 fund was purchased by beneficiaries, and not received or collected or disbursed by the commissioner, and cited 11 Hum., 323.
Ninth — On allowing any compensation to R. Far-quharson for taking care of the funds of the infants when a large sum was lost by his failure to take security.
Tenth — On the allowance of fees to J. M. Bright on behalf of the infants, when the adults should be charged with all — they being the proper complainants whom he represented.
Eleventh — On the allowance of fees as to slaves, &c., held to be equitable assets, and so not in their hands as executors.
A. S. Makes submitted an argument on the petition, and insisted that R. Farquliarson could have no active relief on the Todd note, because he did not appeal: citing Code 3151, 2970; Gilchrist v. Cannon, 1 Cold., 581.
Second — That he ought to have no compensation, as he was not charged with interest and has not performed his whole duty: 2 Heis., 65.
Third — That commissions are erroneously allowed on money not “collected and paid over,” commenting on 11 Hum., 323, and the Code.
Fourth — That no commissions ought to be allowed on re-sales; a means of collecting former bids.
Fifth — That costs and commissions ought not to bear interest.
Sixth — That counsel fees ought not to bear interest.
Seventh — That the beneficiaries ought not to be charged with costs.
*652 JOHN C. BeowN, in answer to the petition for rehearing and brief, insisted that the decision is in harmony with Lester v. Vick, and Porter v. Moores. He contested the fact as to. the loss of funds by Farqu-harson. Insisted that the infants must contribute to the solicitor’s fees for obtaining sales of negroes and lands. Insisted that Code ■ 3151 applied, where there was judgment against several, with appeal by one or more — not to a general appeal by all of the complainants. That the case, in 11 Hum., does not hold the rule claimed. That it was decided before discretionary power, was conferred by the Code 4552. That commissions on re-sales stood on the footing of commissions on original sales, but if not, they were allowable under Code 4552. Admitted that costs did not bear interest, but commissions were to be retained out of the fund, and so should be credited at the date when they might have been retained. So of solicitor’s fees. This would be equivalent to allowing interest.
Re-hearing refused, March 10, 1871.

 In the case of Thos. M. Andrews et als. v. John T. Andrews, decided on the 22nd day of February, 1871, the court said of an exception taken by a guardian to an account: “Defendant excepts because he is charged with interest during the existence of the war. This exception, is not well taken. He does not show that he made no interest and could make none. We can not presume, because a war existed, that the funds in his hands were not drawing interest.” * * * * * * “Because the master has compounded interest during the war. For the reason already stated, in regard to a former exception, this exception is not well taken.”